1
2
3
4
5
6
7
8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL A. BELL

11            Petitioner,                    No. CIV S-08-2281 KJM CHS

12      vs.

13   DERRAL G. ADAMS,

14            Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                      I.  INTRODUCTION

17            Petitioner Michael A. Bell, a state prisoner, proceeds pro se with a petition for

18   writ of habeas corpus brought pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving an

19   indeterminate prison term of 15 years to life for committing second degree murder in 1994.  At

20   issue here are petitioner's subsequent convictions in the Sacramento County Superior Court, case

21   number 00F04818, of two counts of battery by an inmate for which he was sentenced to a 10 year

22   prison term.

23                     II.  BACKGROUND

24            The following statement of facts was taken from the unpublished opinion of the

25   California Court of Appeal, Third District, on direct review.  Petitioner is the defendant referred

26   to therein.  Since these factual findings have not been rebutted with clear and convincing

                                  1

evidence they are presumed correct.  28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004).

On June 9, 1999, Dale Apodaca was working as a correctional officer at California State Prison, Sacramento. Another officer, Alex Andrews, informed Apodaca that defendant, an inmate, had left a building and gone into the yard in violation of Andrew's direct order not to do so. Andrews asked Apodaca to assist him in approaching defendant.

Andrews told defendant he was going to handcuff him for disobeying the order. Defendant refused, yelling, "I'm not going to fucking cuff up and turn around." Attempting to diffuse the situation, Apodaca told defendant to calm down, assuring him he could see the sergeant if he allowed Andrews to handcuff him and take him to a holding cell. Defendant continued to refuse and continued to yell and curse.

Apodaca reached out with his right arm to have defendant turn around. As Apodaca did this, defendant hit Apodaca in the forehead with his closed fist. Apodaca lost his balance for a moment, staggering back three or four feet. Then he charged defendant and bear-hugged him in the chest to gain control of him. Andrews joined in the fray, and Apodaca fell on top of defendant. Defendant kept hitting Apodaca in the head and chest until other officers arrived and contained him.

As Apodaca got up off of defendant, defendant kicked him. Apodaca suffered permanent injuries to his leg, and as a result, was no longer able to work as a correctional officer.

On April 19, 2000, Correctional Officer Richard Mendoza was supervising the gymnasium at California State Prison, Sacramento. Defendant was one of about 15 inmates inside the gymnasium. At about noon, a melee broke out in the yard. Mendoza heard the officer in the central tower order all inmates in the yard to get down. He also heard shots of tear gas fired into the yard.

Mendoza immediately ordered the inmates in the gymnasium to get down. The inmates complied. Mendoza next opened the gymnasium door and stepped just outside the door's threshold. He did this to see if the staff in the yard needed additional help, and also to provide himself an avenue of escape in case the incident spread to the gymnasium.

After taking a quick look at the yard, Mendoza stepped back into the gymnasium. The microphone to his radio fell off his utility belt. As he reached down to grab the microphone, defendant "blindsided" him and hit him on the left side of his face. The blow pushed Mendoza into a locker and spun him around to

> face defendant. Mendoza grabbed defendant and began struggling and fighting with him. Defendant continued punching Mendoza in the head and face. Other officers arrived and subdued defendant. No other inmates were involved.

*People v. Bell*, No. C045135, 2006 WL 181677 at 2 (Cal.App. 3 Dist., 2006).

An information filed in 2000 charged petitioner with three counts of battery by an inmate in violation of California Penal Code section 4501.5, two of which were based on the above incidents, in addition to one count of interference with an executive officer in violation of Penal Code section 69.  It was alleged for purposes of California's "three strikes" law (*see* Cal. Penal Code §§ 667(b)-(i), 1170.12(a)-(d)) that petitioner had previously been convicted of murder.  In 2001, a jury acquitted petitioner of one of the three battery counts (the one not arising from the two incidents described above); the jury was unable to reach a verdict on the remaining counts.

In 2003, petitioner was retried on the two remaining battery counts.  Petitioner elected to represent himself but did not appear at trial.  This time, the jury convicted him and further found the prior murder conviction allegation true.  An aggregate prison term of 10 years was imposed.

Petitioner appealed to the California Court of Appeal, Third District.  Except for the correction of a clerical error in the abstract of judgment, the court of appeal affirmed the judgment and sentence in an unpublished opinion.  Petitioner sought habeas corpus relief in the state courts which was likewise denied.  The parties agree that the claims presented here were properly exhausted in state court and timely presented.  Respondent contends, however, that petitioner's prosecutorial misconduct claim is procedurally barred.

### III.  GROUNDS FOR RELIEF

The pending federal petition presents six grounds for relief.  Each will be separately set forth and discussed in the order of presentation except that petitioner's second ground for relief will be addressed first herein.  Petitioner claims:

1    (A)  He was involuntarily removed from the courtroom during trial and unconstitutionally

2  tried in absentia and without counsel;

3    (B)  Insufficient evidence supported the convictions;

4    (C)  The trial court erred in failing to instruct on self-defense;

5    (D)  The trial court erred in failing to give a unanimity instruction;

6    (E)  The prosecutor committed prejudicial misconduct; and

7    (F)  The trial court unconstitutionally imposed an upper term sentence in violation of the

8  Supreme Court's holding in *Blakely v. Washington*, 542 U.S. 296 (2004).

9              IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

10             An application for writ of habeas corpus by a person in custody under judgment of

11  a state court can be granted only for violations of the Constitution or laws of the United States.

12  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

13  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

14  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

15  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

16  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

17  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

18  state court proceedings unless the state court's adjudication of the claim:

19             (1) resulted in a decision that was contrary to, or involved an
              unreasonable application of, clearly established Federal law, as
20             determined by the Supreme Court of the United States; or

21             (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
22             State court proceeding.

23  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

24  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

25  This court looks to the last reasoned state court decision in determining whether the law applied

26  to a particular claim by the state courts was contrary to the law set forth in the cases of the United

4

1  States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v.*

2  *Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919. It is the habeas corpus

3  petitioner's burden to show the state court's decision was either contrary to or an unreasonable

4  application of federal law. *Woodford v. Visciotti*, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).

5  V.   DISCUSSION

6          A.     Trial in Absentia

7          Petitioner claims that he was unconstitutionally tried in absentia without counsel.

8  On direct review, the California Court of Appeal set forth a lengthy summary of the background

9  to this claim detailing petitioner's participation in the case. It is noted that petitioner has not

10  attempted to rebut any of the court of appeal's factual findings with clear and convincing

11  evidence.

12          **[*Requests for appointment before Judge Tochterman*]**

13          At the 2001 trial, attorney David Muller represented defendant.
The court declared a mistrial on June 6 and reset the matter to June

14  22. On June 22, 2001, defendant refused to appear, but the court
acknowledged attorney Ronald Castro now represented him.

15

16          In November 2001, Castro asked to be relieved as counsel in part
because he was leaving the country for a long period of time and
defendant did not want to wait for his return before proceeding to

17  trial. The court appointed attorney Frances Huey.

18          The case was set for trial on April 22, 2002, but Huey was ill, so
the court vacated the trial date. Trial was rescheduled for July 9,

19  but at Huey's request, the court put trial over to accommodate a
motion by defendant to set aside the information under section 995.

20  Defendant claimed the court had erred by allowing him to remove
himself from his preliminary hearing. On September 13, 2002, the

21  court denied the motion. The court set the matter for further
proceedings on September 24.

22

23          On September 24, Huey was in trial on another matter and could
not appear. Defendant orally made a *Marsden* motion (*People v.*

24  *Marsden* (1970) 2 Cal.3d 118), which the court set for October 15.
At that hearing, defendant was represented by an unidentified

25  public defender who informed the court attorney Castro was again
inheriting the case from attorney Huey. On November 29, the court

26  set trial for April 16, 2003.

On April 16, the prosecutor and attorney Castro announced they were ready to proceed, but no courtrooms were available. The prosecutor announced he would not be available again until the end of May. The court set trial for May 21.

At this point, defendant addressed the court. He stated the delays in getting this case to trial were holding up a transfer for him from an administrative segregation unit to another facility. If trial could not start that day, he offered to change his plea to no contest to both charges and be sentenced at that time.

The prosecutor asked the court not to agree to defendant's request. He had already offered defendant the low term on one count as a plea bargain, and believed it would not be fair to "up the ante" just because defendant wanted to plead.

The trial court noted defendant's objection, but set trial for May 21. It also scheduled a hearing for the next day, April 17, where defendant could announce whether he wanted to change his plea.

At the April 17 hearing, defendant repeated his request to plead guilty to both counts if he could not get a trial so he could be transferred out of administrative segregation. The court confirmed the offer made by the prosecution (low term on one count, doubled) was still available. Defendant, however, did not want a plea bargain. He wanted a trial.

The court gave defendant a choice. He could change his plea, or wait for trial on May 21. In response, defendant orally filed a *Marsden* motion. The court explained granting that motion would extend the trial until a new attorney could assume the case and become prepared. Defendant proceeded with his motion. The court convened an in camera hearing, denied the *Marsden* motion, and ordered the transcript of the hearing sealed.

Back in open court, defendant next asserted his right to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta* ) [45 L.Ed.2d 562]. The court urged defendant not to represent himself, explaining the numerous and difficult problems he would encounter preparing a case while in administrative segregation. The court explained it could not assist defendant if the prison put restrictions on his library privileges. The court also explained it would not delay the case if he later decided to hire an attorney.

Defendant, however, was adamant. The court in writing informed defendant he was entitled to be represented by counsel at any stage of the case but the court would not delay the case after he waived his right to counsel to allow an attorney to prepare to represent him. After giving oral and written warnings, the court reluctantly relieved attorney Castro as defendant's attorney of record. Trial remained set for May 21. Castro agreed to copy his files and have

them delivered to defendant.

On May 13, eight days before trial, defendant filed motions for an order unsealing the April 17 *Marsden* hearing transcript, and for an order to compel the Department of Corrections to allow him pro per privileges for preparing his case. He claimed he had been denied the use of prison procedures afforded to pro per prisoners.

On May 16, Judge Ronald Tochterman denied defendant's motions for lack of good cause. Regarding the pro per privileges, the court directed defendant to file a petition for an order to show cause to hold the Department of Corrections in contempt.

After the court confirmed the trial date of May 21, defendant moved to continue the trial date because he had not yet received the case records from Castro. The court denied the motion for lack of good cause and failing to comply with the procedural requirements for seeking continuances, as set forth at section 1050. Defendant complained he could not comply with the statute because he had no access to the law library. The court again directed defendant to file a petition for an order to show cause with respect to contempt.

In response, defendant asked to withdraw his *Faretta* waiver, claiming he was not being allowed an adequate opportunity to defend himself. The court continued the matter to May 19 to learn if attorney Castro would be willing and ready to proceed to trial on May 21.

At the May 19 hearing before Judge Tochterman, attorney Castro refused to be appointed as defense counsel due to his past relationship with defendant. Castro complained defendant manipulated him and was untruthful. Fern Laetham, executive director of Sacramento County Conflict Criminal Defenders, stated a new appointment would be defendant's fifth. It would take two or three months before a new attorney could be ready to try the case. She offered to find a new attorney and have new counsel set a trial date in a week. The prosecutor did not oppose continuing the case to allow for new counsel.

When the court asked defendant if he agreed to that proposal, he stated he wanted to continue representing himself, and he filed a written motion for a 90-day continuance to allow him to prepare a defense. Defendant claimed good cause existed because he had not yet received the case files from his prior attorney. The court asked whether defendant was now withdrawing his request for an attorney, and defendant confirmed he was doing so.

The court denied the motion for continuance: "I'm not going to grant an evidentiary hearing unless you file a declaration under penalty of perjury satisfying me that there may be some basis for

what you are talking about. You have to set forth in detail what requests you have made, when you have made them, to whom you have made them and what responses have been made. So far I haven't seen anything like that."

The court confirmed the trial date, at which point the following occurred:

"THE DEFENDANT: "I withdraw my right. I see that you guys are not going to fairly let me represent myself; that I don't get the same privileges as an attorney did when you-

THE COURT: [Defendant], you don't get to make a speech. First you make a motion and then maybe-

THE DEFENDANT: I made the motion. What I am saying-

THE COURT: I don't know what the motion-wait a moment.

He is interrupting me. [Defendant] is interrupting me. I order that he be removed from the courtroom.

THE DEFENDANT: Fuck this courtroom."

As defendant was removed from the courtroom he spat at the judge. The court stated: "For the record, [defendant] actually spit in the direction of the bench. I don't know if he hit anybody, and he said what he said. [¶] I'm satisfied that his most recent motion was made in bad faith and was an effort to manipulate the Court given the history of that, have been now informed about."

*People v. Bell*, *supra*, at 3-5.

**[*Request for appointment before Judge Gilliard*]**

The case came on for trial on May 21 before Judge Maryanne Gilliard. When the court asked defendant if he was ready to proceed, he replied, "No." He explained he had not received any files from his previous attorney and had not been able to interview witnesses. Because his request for a 90-day continuance had been denied, he requested appointment of counsel.

Defendant's investigator explained she had received the files and mailed them to the prison, but they apparently had not been delivered to defendant. Defendant renewed his motion for a 90-day continuance. The court denied both requests for counsel and a continuance.

Defendant then waived his right to appear at trial. The court directed the prosecutor to do whatever he could to facilitate

delivery of the case files to defendant that day.

The following day, May 22, defendant indicated he received a box of materials the prior evening. The court indicated it was reconsidering defendant's request for a continuance. It made the following findings: "That [defendant] has made repeated and multiple requests for appointment of counsel; that [defendant] has previously been represented by at least four different attorneys throughout the course of this case; that there have been at least five *Marsden* motions made with respect to the number of attorneys that have been representing [defendant], that [defendant] has been granted pro per status at least twice, the most recent being on April 17th of this year; that even on April 17th of this year after a *Marsden* motion was denied and [defendant] was granted his [*Faretta* ] rights and warned accordingly that subsequent to that granting of pro per status [defendant] again renewed his request for an attorney. Said request being denied.

"And then there have been multiple requests between April 17th and today's date for either appointment of counsel, motions to continue the trial date, as well as requests made on the same date for either appointment of counsel [or] the ability to proceed pro per and for motions to continue the trial.

"I do find that this is an attempt to delay trial in this matter. That these motions are not made in good faith. That [defendant] was appropriately given his [*Faretta*] warnings and is going to proceed in this case pro per."

Nonetheless, the court believed defendant was unable to prepare for trial adequately due to the "bureaucracy inherent in the running of a prison." The court granted defendant a 30-day continuance, the amount of time it believed defendant would have possessed the case files to prepare for trial had not the bureaucracy failed to deliver them timely. The court set trial for June 23, 2003, and instructed defendant to be prepared by that day.

*People v. Bell*, *supra*, at 6.

**[*Shackling*]**

During the 30-day continuance period, defendant filed a petition for writ of mandate with this court, which was denied. He also filed a *Pitchess*[FN2] motion for discovery in a different department to be heard on July 1.

    FN2. *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

At trial on June 23, defendant's first order of business was to request a continuance until after his *Pitchess* motion was heard.

The court denied his request. Defendant next moved to disqualify Judge Gilliard. The court denied that motion as untimely. Defendant then asked to waive his right to be present at trial.

The court agreed to accept the waiver, but, relying on *People v. Gutierrez* (2003) 29 Cal.4th 1196, it required defendant to be present at least until a jury was called, unless he wanted to waive his right to a jury. Defendant stated he did not want to waive his right to a jury, but he did not want to be in the courtroom if he could not have an attorney. The court stated he would have to be in the courtroom until the panel came in and the court made its introductory remarks.

At this point, defendant apparently attempted to get up from his chair and roll the chair down the aisle. As officers restrained him, defendant said, "I change my mind already."

At some earlier point, defendant had requested not to be restrained in front of prospective jurors, and he had asked to be dressed out. After defendant was restrained, the court asked an officer from the Department of Corrections whether, in light of defendant's attempt to get up from his chair, it was prepared to allow defendant not to be handcuffed during jury selection. The officer recommended defendant stay in restraints for public safety. Without ruling on the point, the court took a small recess and directed the officers to dress defendant out.

After the recess, however, defendant refused to leave his holding cell and return to the courtroom. He told the officer and his investigator he would not enter the courtroom without an attorney and he would be disruptive if he did return without an attorney.

The court reconvened the proceedings at the holding tank. The court confirmed defendant had signed a section 977, subdivision (b) waiver of his right to be present during all portions of the trial. As the court attempted to ascertain his understanding of the rights he was waiving, defendant either did not respond or said, "I plead the Fifth." At one point, he said he wanted an attorney to represent him. The court acknowledged his request, but stated that motion had been previously denied.

The court found defendant voluntarily and knowingly waived his right to be present at trial. It ordered defendant's investigator to determine defendant's status each day during trial. The court also announced it would not order officers to perform any kind of cell extraction against defendant so as to protect the officers from risk of injury.

Defendant asked for permission to have his investigator take a photograph of him to be presented to the jury. The court allowed that request. The court then reconvened in the courtroom and

empanelled the jury.

The next day, June 24, the court commenced proceedings by inquiring of defendant's status. His investigator informed the court defendant would participate only with an attorney. At that point, defendant entered the courtroom and requested an in camera hearing to explain the situation and express himself about it. The court refused, saying it could not participate in ex parte communications with a party. Defendant asked if the prosecutor could join them. The court again refused and asked defendant to express himself in open court. He refused.

Defendant stated he intended to present a defense, call witnesses, and be present in court to do that. Defendant gave the court an offer of proof of the facts to which four witnesses would testify. He stated his investigator had been unable to interview two of the witnesses because they were in a lockdown when the investigator went to the prison to meet with them. Defendant asked to have the prisoners brought to court so the investigator could interview them. The court agreed to sign the orders to produce, expressing confidence the Department of Corrections would make all necessary efforts to secure the witnesses' timely appearances.

With defendant still present, the court conducted a security hearing. A deputy sheriff testified defendant posed a serious threat to public safety if security measures were not taken at trial. He asked for defendant to be secured to the court chair with only his writing hand free of restraints.

The deputy testified defendant's disruptive behavior had escalated since being incarcerated in 1996. Defendant had received six write-ups for batteries on peace officers; five write-ups for resisting staff by force; seven write-ups for batteries on inmates; two write-ups for inciting other inmates; and 27 write-ups for refusing to comply with orders.

Before one court proceeding in this case, defendant refused to leave the van and had to be removed physically. In another, defendant had to be physically extracted. In the hearing before Judge Tochterman, defendant spat on the floor after the court ruled against him. And on the preceding day, defendant attempted to leave the courtroom and had to be physically restrained.

Defendant argued one of the incidents was fabricated, and the others related to proceedings before other judges. The court found manifest necessity for restraints, and granted the sheriff department's request. However, the court required defendant's writing hand to remain free so he could take notes during the trial. After ruling, the court asked defendant if he wanted to be present for the prosecution's case. Defendant said he did not. He returned to the holding tank, and the prosecution proceeded with its case.

1   After Officers Mendoza and Apodaca testified, the prosecution
    rested, and the court recessed for lunch.

2

3   *People v. Bell*, *supra*, at 7-9.

4   **[*Denial of recess to interview witnesses*]**

5   At the commencement of the afternoon session, defendant
    appeared in court outside the jury's presence. He was under the
6   impression when his witnesses arrived, he and his investigator
    could interview them briefly before putting them on the stand. The
7   court understood defendant's position and that two of his witnesses
    had arrived, but stated it would permit him only to put them on the
8   stand. Defendant had already provided an offer of proof of what he
    expected their testimony to be. The court would not grant him
9   more time and delay the jury any further.

10  Defendant replied: "Well, I won't do what I can then. I will not do
    it like that being that I'll be setting myself up if I do it like that. I
11  don't know exactly to what they going to say. I just have a general
    idea. And I don't want to bring them up, and it will be more
12  damaging than good. So under those circumstances I can't proceed
    with it."

13

14  The court asked defendant if he wanted to see the prosecution's
    exhibits before they were moved into evidence. Defendant refused.
15  The court encouraged defendant to look at them, but he refused to
    do so unless counsel represented him. He also again waived his
    right to be present for further proceedings.

16

17  The court accepted that waiver, but indicated for the record
    defendant had consistently engaged in a pattern of manipulation,
18  delay, and attempts to thwart the trial from going forward.  It noted
    the positive efforts made by the Department of Corrections in
19  response to defendant's late requests for witnesses that morning.
    The Department had secured the physical presence of two
20  witnesses from California State Prison, Sacramento, and had
    arranged for the two other witnesses from Pelican Bay and
21  Corcoran State Prisons to testify by means of closed circuit
    television.  The court concluded defendant's requests for delaying
22  the afternoon session were untimely and made for the purpose of
    further thwarting the system of justice.  The court was not going to
23  take any more time from the jurors' busy schedules and the trial to
    accommodate an investigation that should have been conducted
    months before.

24

25  The court again asked defendant if he wanted to participate in a
    defense or go back to the holding cell.  Defendant asked his
26  investigator to explain the steps she took to obtain and interview
    the witnesses, and then he would "peace out and let you guys finish

12

1    the trial."

2    The investigator stated she wrote a letter asking for permission to
     visit the potential witnesses in prison. Two of the proposed
3    witnesses responded in writing agreeing to her visit. The next time
     the investigator was able to visit the prison, the prison was in a
4    lock down and she was not allowed to have a confidential visit
     with the witnesses. She was unable to visit with the witnesses
5    before trial.

6    Upon again requesting an attorney, and again being denied one,
     defendant left the courtroom and went back to the holding tank.
7    The jury deliberated that afternoon, convicted defendant on both
     counts, and found true the prior conviction allegation.

8

9    *People v. Bell*, *supra*, at 11-12.

10          In *Faretta v. California*, the United States Supreme Court held that a criminal

11   defendant has a right to knowingly and intelligently waive his Sixth Amendment right to counsel

12   and choose self-representation, even though he may ultimately conduct his defense to his own

13   detriment.  *Faretta*, 422 U.S. 806, 834-35 (1975).  Ordinarily, a waiver of counsel can

14   subsequently be withdrawn and the right to counsel may be reasserted.  *See United States v.*

15   *Taylor*, 933 F.2d 307, 311 (5th Cir. 1991) ("This court has long held that a defendant who waives

16   the right to counsel is entitled to withdraw that waiver and reassert the right."); *see also*

17   *Menefield v. Borg*, 881 F.2d 696, 700 (9th Cir. 1989) (rejecting "conception that the defendant's

18   initial decision to exercise his *Faretta* right and represent himself at trial is a choice cast in

19   stone").

20          The right to reassert the right to counsel following a *Faretta* motion is not

21   unqualified, and *Faretta* recognized as much.  *See Faretta*, 422 U.S. at 835 n.46 ("The right of

22   self-representation is not a license to abuse the dignity of a courtroom.").  The Sixth Amendment

23   right to self-representation does not protect defendants who abuse it by obstructing judicial

24   proceedings.  *See Id*.  A request to withdraw *Faretta* rights and resume with counsel can properly

25   be denied where a necessary continuance would adversely affect the proceedings or where the

26   delay is attributable to the defendant's conduct.  *See Taylor*, 933 F.2d at 311 ("A trial court need

13

1   not countenance abuse of the right to counsel or the right to waive it."); *McQueen v. Blackburn*,

2   755 F.2d 1174, 1178 (5th Cir. 1985), cert. denied 474 U.S. 852 (trial court must be wary of

3   repeated changes of position on counsel or late requests to change counsel made to delay trial or

4   impede the prompt and efficient administration of justice); *United States v. Studley*, 783 F.2d

5   934, 938 (9th Cir. 1986) ("When the defendant's [S]ixth [A]mendment right to counsel is

6   implicated, [ ] a court must balance several factors to determine if the denial [of a continuance

7   motion] was "fair and reasonable.").

8          In addition, the Confrontation Clause of the Sixth Amendment and the Due

9   Process Clause of the Fifth Amendment secure a criminal defendant's "right to be present at any

10  stage of the criminal proceeding that is critical to its outcome if his presence would contribute to

11  the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). "A defendant's

12  knowing, intelligent and voluntary absence from his trial acts as a waiver of his Sixth

13  Amendment right to confrontation." *Brewer v. Raines*, 670 F.2d 117, 119 (9th Cir. 1982). In

14  addition, the United State Supreme Court has explicitly held "that a defendant can lose his right

15  to be present at trial if, after he has been warned by the judge that he will be removed if he

16  continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so

17  disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in

18  the courtroom." *Illinois v. Allen*, 397 U.S. 337, 343 (1970).

19         Petitioner has failed to demonstrate that the court of appeal unreasonably applied

20  the law of *Faretta* or *Illinois v. Allen*, and further failed to demonstrate that he suffered a

21  constitutional violation. At the outset, it is noted that the jury was instructed not to speculate as

22  to the reasons for petitioner's absence, and that his absence must not be considered for any

23  purpose. (Reporter's Transcript of Proceedings ("RT") at 1200.) It is presumed that the jury

24  followed these instructions. *See Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987).

25         When petitioner first moved to represent himself, the trial court thoroughly

26  cautioned him, indicating it was "not a wise decision," that it was "seldom wise for a defendant

14

1 to represent himself," and that his "capable" attorney "should" represent him. (RT 1094.) The

2 court cautioned there were potentially

3        all kinds of investigation problems, all kinds of subpoena
         problems. There are library privilege problems. There are any
4        number of problems that you generate for yourself when you elect
         to represent yourself. And particularly, you're currently in
5        administrative segregation. I don't know how long that is going to
         last. I don't know why that is. It doesn't make any difference to
6        me why that is, [it's] just going to create any number of problems
         for you, and it is just not a wise decision.
7

8 (RT at 1095.)  Additionally,

9        [I]f you represent yourself Mr. Bell, [ ] the court will not be cutting
         you any slack, as it were, that you will be expected to not only
10       conform to the rules of court, but you will be expected to know the
         Evidence Code sufficiently that will allow you to object properly.
11

12 (RT at 1097.)  Petitioner was advised he would not be able to claim ineffective assistance of

13 counsel on appeal. (RT at 1097.)  Further, that "the Court does not run the state prison system.

14 And if they put restrictions on your library privileges, that's between you and the prison." (RT at

15 1098.)  "I don't think you're a disruptive individual, but if you are, do you understand that you

16 can be removed from the courtroom?" (RT at 1100.)  And finally, "the Court will not delay this

17 case to allow some other attorney to prepare to represent you, if you [later choose] to hire

18 someone." (RT at 1101.)

19        Both the trial court and state appellate court reasonably found petitioner's

20 subsequent behavior as detailed above to be calculated to delay and disrupt the trial. Petitioner

21 consistently refused to cooperate with the court, making it extremely difficult to proceed. The

22 trial court had ample reason to believe that these obstructionist tactics would continue if

23 petitioner were permitted to change his mind once again and reassert his right to counsel.

24        Moreover, as set forth, petitioner had been warned in detail about the various

25 problems inherent in self-representation, including those related to subpoenas and securing

26 witnesses; he nevertheless insisted on representing himself. In denying petitioner's request to

1 recess trial so he could interview two of his witnesses before their testimony, the trial court

2 reasonably found that such interviews should have taken place long before.  The trial court put on

3 the record that the Department of Corrections had basically done "everything within their power

4 to accommodate what were late [witness] requests, and in some instances non-subpoenaed

5 witnesses from as far away [as] Pelican Bay and Corcoran State Prison to be present..."  (RT at

6 1181.)  Under the circumstances of this case, the fact that petitioner subsequently chose to absent

7 himself because he was not allowed a recess at trial to interview witnesses for whose testimony

8 he had already given an offer of proof was reasonably found by the state courts to be a knowing,

9 intelligent and voluntary waiver of his right to be present.  Accordingly, the court of appeal's

10 rejection of this claim was not contrary to, or an unreasonable application of any clearly

11 established Supreme Court precedent, and petitioner's trial, conducted in absentia and without

12 counsel, was not unconstitutional.

13                          B.          Sufficiency of the Evidence

14                          Petitioner claims the prosecution failed to introduce sufficient evidence to support

15 the convictions.  In particular, he contends that because he voluntarily absented himself from trial

16 when the jury was present, he was not identified in court as the perpetrator of the charged

17 offenses.

18                          Before the presentation of evidence, petitioner requested to have his investigator

19 take a picture of him to be presented to the jury; the court allowed the picture to be taken but

20 indicated that its use would depend on various foundational issues.  (RT at 1142.) At this time,

21 petitioner was still representing that he intended to be in the courtroom to present his defense.

22 (RT at 1146.)

23                          During the prosecution's case, Officers Apodaca and Mendoza each identified

24 petitioner by name and by photograph exhibit as the person who attacked them as they described.

25 (RT at 1155 & 1166.)  The photograph used was identified as exhibit 8, a "Copy of color photo

26 of Michael Bell."  (Clerk's Trancript of Proceedings ("CT") at 417.)

1    Petitioner subsequently declined to present a defense or to be present in the

2 courtroom with the jury present (RT at 1179), and thus he did not appear before the jury at any

3 time.  As the prosecution rested, the trial judge asked him outside the presence of the jury

4 whether he wanted to examine the prosecution's exhibits, including exhibit 8, the photograph

5 used for identification.  Petitioner responded that he did not.  Over the trial court's urging,

6 petitioner refused to look at the exhibits; his only reasoning was that he "wouldn't understand

7 them."  (RT at 1179-80.)  The trial court put on the record that

8    contrary to any assertion that he doesn't understand or that he lacks
     the capacity for – to participate, I make a finding that Mr. Bell is
9    intelligent, that he understands the court process, and that he
     understands very well that the manipulation that he's engaged in
10   has caused certain delays in this trial.

11 (RT at 1181.)

12    On appeal, the state court rejected petitioner's claim that his identity had not been

13 properly established.  Applying state law, the court of appeal held that although a criminal

14 defendant can ordinarily be required to be present in the courtroom for identification purposes,

15 other means of identification were allowed when the defendant cannot be made to appear.

16 *People v. Bell*, *supra*, at 14.  The court reasoned:

17    Showing the witnesses a single photo of the defendant is no more
     *impermissibly* suggestive than an in-court identification with the
18   defendant personally sitting at the defense counsel table in the
     courtroom.
19
     The trier of fact could reasonably deduce that the photograph of
20   Inmate Bell submitted into evidence was the same defendant Bell
     being tried in this case. Otherwise, we would be forced to
21   determine the prosecution committed a fraud on the court, a fraud
     the trial court would have easily detected due to its familiarity with
22   defendant. Nothing in the record indicates that to have been so.

23    Defendant has little standing to fault the identification procedure
     used. After he refused to leave the holding tank to appear in court
24   for jury selection, and the court ordered officers not to extract him
     to protect their own safety, the prosecution was left with no option
25   but to show a photograph of defendant to the witnesses and jury.
     Here, as noted, the assertedly unreliable photographic identification
26   procedure was necessitated by defendant's own disruptive conduct.

17

1
2

> Under these circumstances, we find no undue unfairness in that procedure.
>
> We also note the number on "M Bell's" photograph, K-10775, is the inmate number assigned to defendant by the Department of Corrections. The jury correctly identified defendant as the "Inmate Bell" who committed the batteries against Officers Apodaca and Mendoza.

3
4
5

6 *People v. Bell*, *supra*, at 14-15 (internal citations and quotation omitted).

7         The Due Process Clause protects the accused against conviction except upon

8 proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970).  On habeas corpus

9 review, sufficient evidence supports a conviction so long as, "after viewing the evidence in the

10 light most favorable to the prosecution, any rational trier of fact could have found the essential

11 elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

12 (1979); s*ee also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  The

13 dispositive question is "whether the record evidence could reasonably support a finding of guilt

14 beyond a reasonable doubt." *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting

15 *Jackson*, 443 U.S. at 318).  Under the AEDPA, this standard is applied with an additional layer

16 of deference: the relevant question is "whether the decision of the California Court of Appeal

17 reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts of this case." *Juan H.*

18 *v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005) (citing 28 U.S.C. § 2254(d)(1)).

19         Identity may be proved by inference.  *See United States v. Hernandez*, 876 F.2d

20 774, 777 (9th Cir. 1989), *cert. denied*, 110 S. Ct. 179.  Here, although the record does not contain

21 an overt finding that the picture was one of petitioner, nothing in the evidence indicated that any

22 "inmate Bell" other than petitioner was present during the events described by the witnesses, and

23 the only reasonable inference to be drawn was that the photograph was one of the defendant

24 being tried.  Accordingly, viewing the record evidence in the light most favorable to the

25 prosecution, the state court's rejection of the claim was not an unreasonable application of the

26 *Jackson* or *Winship* standards.

C.      Self-Defense Instruction

Petitioner claims that substantial evidence at trial supported a theory of self-defense as to the battery against Officer Mendoza.  Petitioner argues that since Mendoza testified he was "blindsided" in the midst of "chaos and commotion," he could have been mistaken as to who initially hit him, and if so, then petitioner's subsequent actions were self-defense and the trial court should have given a self-defense instruction sua sponte.  The California Court of Appeal rejected this claim, holding that the trial court was not required to so instruct because the evidence did not support a theory of self-defense.  *See People v. Bell*, *supra*, at 15-16.

Petitioner's claim of instructional error does not raise a cognizable federal claim unless the error, considered in context of all the instructions and the trial record as a whole, "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991); *see also Henderson v. Kibbe,* 431 U.S. 145, 152-55, n.10 (1977); *Cupp v. Nauhten,* 414 U.S. 141, 146-47 (1973).  In addition, on federal habeas corpus review, no relief can be granted without a showing that the instructional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  An omitted instruction is less likely to be prejudicial than a misstatement of the law.  *Kibbe*, 431 U.S. at 155.  In addition, reversal will rarely be justified for failure to give an instruction when no objection was made in the trial court, as the case is here.  *See Id*. at 154.

Even assuming for purposes of this opinion that petitioner's claim is cognizable-i.e., that a criminal defendant in state court has a due process right to have the jury instructed on affirmative defenses- it is clear that relief is not warranted.  Contrary to petitioner's assertion, Mendoza's testimony did not support an inference that he did not see who "blindsided" him.  Mendoza's testimony was, in relevant part, as follows:

Q:      While you were standing there anything happen to you?

A:      I was assaulted by Inmate Bell.

1  (RT at 1161.)   And further:

2              [A]:     He struck me.  He kind of blindsided me.  Socked me once inside the left side of my face.

3

              Q:     Okay.  What did you do?

4

5              A:     At which time he did the punch, the momentum kind of spun me around, and my left – what happened was I got spun around where I was actually facing him.  My left

6                        shoulder, I bumped into the ball locker right here.

7  (RT at 1162.)   And finally:

8              A:     Yeah.  I'm looking out and looking out at this time.  I reach down to pick up my mike that was hanging off the side of

9                        my – off my utility belt, at which time that's when I was blindsided.  I was hit, punched on the left side of my face.

10                      The momentum pushed me into the locker.  Actually, I spun around where I was facing Inmate Bell.

11

12              Q:     And that would have been approximately where that officer is standing there?

13              A:     Correct.  That's where I landed.

14              Q:     Okay.  What happened after that?

15              A:     Well, knowing what was going on, I immediately grab Inmate Bell trying to get my senses and began to struggle

16                      and fight with him.  And soon after that Officer Barsley who was a responding staff member entered into this gym,

17                      wound up grabbing Inmate Bell, able to tackle him and get him on the ground.  And by that time more responding staff

18                      entered the gymnasium, and Inmate Bell was placed in handcuffs.

19

20              Q:     While you were struggling – well, strike that.  After the initial contact when Bell attacked you, did he back away?

21              A:     No.  He continued on attacking –

22              Q:     He didn't –

23              A:     – punching.  He continued to punch.  Punched me on my head, facial areas.  Just throwing punches from all different

24                      angles to the best of my knowledge.

25              Q:     Were any other inmates involved in this attack on you?

26              A:     No, just himself.

1   (RT at 1162-63.)

2          It is also noted that Mendoza previously testified that all inmates had complied

3   with his order to "sit down."  (*See* RT at 1158.)  Thus, Mendoza specifically identified petitioner

4   as the aggressor, and no evidence indicated that any other inmate was involved in the attack or

5   even standing nearby.  The alleged omission of an instruction on self-defense in no way

6   implicated the fairness of petitioner's trial.

7          D.       Unanimity Instruction

8          In a related claim, petitioner argues that because of the possibility that another

9   inmate first hit Officer Mendoza, the court was required to give a unanimity instruction.  The

10   California Court of Appeal rejected this claim first, for the same reason it rejected the last one:

11   no evidence supported petitioner's theory that a second inmate was involved; and second,

12   because a unanimity instruction is not required under California law where there is only one act

13   or where two or more acts are so closely related in time they form a single transaction.  *People v.*

14   *Bell*, *supra*, at 16.

15          The Fourteenth Amendment does not require a unanimous jury in state criminal

16   trials.  *Williams v. Florida*, 399 U.S. 78, 86 (1970); *Apodaca v. Oregon*, 406 U.S. 404, 410-413

17   (1972).  Thus, in a general sense, criminal defendants in state court have no federal constitutional

18   right to a unanimous jury verdict.  *See Apodaca* , 406 U.S. at 410-12.

19          Moreover, clearly established Supreme Court precedent indicates that the

20   Constitution does not require unanimous agreement of the jury as to the theory or act upon which

21   a defendant's guilt is based.  *See Schad v. Arizona*, 501 U.S. 624, 631-32 (1991).  In *Schad*, the

22   Supreme Court held that when a single crime can be committed by various means, the jury need

23   not unanimously agree on which means were used so long as they agree that the crime was

24   committed.  *Id*. at 631-32; *see also Id.* at 649 (Scalia, J., concurring in judgment) ("it has long

25   been the general rule that when a single crime can be committed in various ways, jurors need not

26   agree upon the mode of commission").  For these reasons, the alleged omission of a unanimity

21

1    instruction did not render petitioner's trial fundamentally unfair in violation of due process.

2          E.      Prosecutorial Misconduct

3          Petitioner claims that the prosecutor is guilty of prejudicial misconduct for (1)

4    improperly arguing to the jury that uncalled witnesses would have given redundant testimony;

5    and (2) presenting Officer Mendoza's testimony, which the prosecutor knew or should have

6    known was false.  Regarding the latter, petitioner argues that the prosecutor should have put on

7    evidence in addition to Mendoza's testimony, such as the testimony of other correctional officers

8    and inmates who testified inconsistently with Mendoza at petitioner's first trial on these charges

9    (at which the jury failed to reach a verdict).  Regarding the former, petitioner complains of the

10   following portions of the prosecutor's closing argument:

11              It's taken me 33 years as a prosecutor to get to this kind of a case.
                I have never seen anything like this.  Yeah, I've had pro per cases,
12              and yeah, I've had people that didn't want to show up, but not at
                the same time...
13
                ...
14
                In this case – kind of case you have to act – I do – as my own
15              guard.  And it's difficult.  And perhaps I didn't put on as much as I
                normally would have tried, but let's get back to the two witnesses.
16              What is it about them that you would find unbelievable?  Nothing.
                What is it that they said that would allow you to doubt them?
17              Nothing.  There was no inconsistencies.  They testified about what
                happened to them.
18
                *Count there have been other witnesses?  Yes.  There were other*
19              *people who were present.  What are they going to say?  Do you*
                *want redundancy?  No.  You don't need that, and I don't need to*
20              *keep you here that long.  And that's why we cut it down to the two*
                *witnesses who were the victims.*
21
                And then think about it in terms of how it would relate to you.  Do
22              you need more than one person to tell you something and say I can
                believe that?  Your spouse, your child, your mom, your dad.  These
23              are single people.  And when they tell you something, yeah, you're
                going to believe it.  Why?  Because it has the aura of truth.  What
24              they said has the aura of truth.  You don't need, well, I just feel
                uncomfortable.  I wish there was someone else.
25
                Gosh, couldn't we have had some other pictures?  No.  That's not
26              necessary.  And it's not being viewed in a vacuum.  It's being

1    viewed in reality of life.  How did they appear?  Did they appear
     like they didn't want to be here?  Did they appear like I don't want
2    to be on the stand?  Were they reluctant to take the oath?  No.
     None of those things.  There's no indications that these officers did
3    anything but tell you the truth.  And, quite frankly, based on what
     you've got here, there is no evidence to the contrary.
4
     In other words, there's nothing that points to this did not happen.
5    It's very unusual, very odd.  It's very uncomfortable for me.  But
     based on what has been presented to you, I believe the evidence
6    more or less just forces you to the position where you should return
     a guilty verdict.
7

8   (RT at 1193-95 (italics added).)

9          On direct review, the California Court of Appeal rejected petitioner's claim of

10   prosecutorial misconduct, holding that he had failed to preserve the issue for appeal by failing to

11   object to the prosecutor's argument at trial.  *People v. Bell*, *supra*, at 16.  The court of appeal

12   rejected the argument that the general forfeiture rule should not apply to his situation:

13          Defendant was clearly and adequately warned of the risks of
            representing himself. He knew he was responsible for making all
14          evidentiary objections. He was also warned of the risks of
            absenting himself from trial. He understood he would not be able
15          to make objections if he was not in the courtroom. Forfeiture of
            claims for failing to object is one of those risks he voluntarily and
16          knowingly assumed.

17   *People v. Bell*, *supra*, at 16.  The court of appeal further rejected petitioner's argument that an

18   admonition would not have cured the alleged misconduct in closing argument:

19          [H]ad an objection been made, the court could have... admonished
            the jury not to infer there were other witnesses, not to speculate
20          what the testimony might have been from other witnesses or what
            other evidence the prosecution might have presented, and not to
21          speculate whether such evidence would have corroborated or
            contradicted the officers' testimony.
22
            ...
23
            Thus an objection was required, but defendant, by choosing not to
24          appear, chose not to object. He thereby forfeited his opportunity to
            raise the objection here.
25

26   *People v. Bell*, *supra*, at 17.

1       Respondent contends that petitioner's prosecutorial misconduct claim is

2   procedurally barred in this court because of his failure to object at trial.  As a general rule, a

3   federal habeas court "will not review a question of federal law decided by a state court if the

4   decision of that court rests on a state law ground that is independent of the federal question and

5   adequate to support the judgment."  *Calderon v. United States District Court (Bean)*, 96 F.3d

6   1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  For a

7   state procedural rule to be independent, the state law basis for the decision must not be

8   interwoven with federal law.  *LaCrosse v. Kernan,* 244 F.3d 702, 704 (9th Cir. 2001).  To be

9   deemed adequate, it must be well established and consistently applied.  *Poland v. Stewart*, 169

10  F.3d 575, 577 (9th Cir. 1999).  An exception to the general rule exists if the prisoner can

11  demonstrate either cause for the default and actual prejudice as a result of the alleged violation of

12  federal law, or that failure to consider the claims will result in a fundamental miscarriage of

13  justice.  *Coleman*, 501 U.S. at 750.

14      Once the state has pleaded the existence of an independent and adequate state

15  procedural ground as an affirmative defense, as respondent has in this case, the burden shifts to

16  petitioner to place the adequacy of that procedural rule in issue, as "the scope of the state's

17  burden of proof thereafter will be measured by the specific claims of inadequacy put forth by the

18  petitioner."  *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir. 2003).  If placed in issue, the

19  state retains the ultimate burden of proving adequacy of the asserted bar.  *Id*. at 585-86.

20      Here, petitioner has failed to place the adequacy of California's contemporaneous

21  objection rule into question.  Petitioner has offered no argument that the contemporaneous

22  objection rule invoked by the state court was not an independent and adequate basis for its

23  decision, nor has he demonstrated cause for his default or that a miscarriage of justice would

24  result if his claim is not heard.  Accordingly, review of his misconduct claim regarding the

25  prosecutor's argument should be found to be barred.  Petitioner has failed to satisfy his interim

26  burden under *Bennett* and it should be concluded that the state procedural bar applied to his case

24

1    rests on an independent and adequate state procedural ground.  *See generally  King v. Lamarque*,

2    464 F.3d 963, 967 (9th Cir. 2006) ("*Bennett* requires the petitioner to 'place [the procedural

3    default] defense in issue" to shift the burden back to the government").  It is noted that the Ninth

4    Circuit has held California's contemporaneous objection rule to be independent and adequate on

5    various occasions, affirming the denial of a federal petition on grounds of procedural default

6    where there was a failure to object to at trial.  *E.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058

7    (9th cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (jury instruction claim

8    procedurally barred for failure to object); *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002)

9    (citing *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981); *Vansickel v. White*, 166 F.3d

10   953, 957 (9th Cir. 1999); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995).

11          Even if a portion of this claim were not procedurally barred, its merits would not

12   warrant relief.  The appropriate standard for a federal court reviewing a claim of prosecutorial

13   misconduct on habeas corpus is the narrow one of whether the conduct violated due process.  *See*

14   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  "The relevant question is whether the

15   prosecutor's error 'so infected the trial with unfairness as to make the resulting conviction a

16   denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S.

17   637, 643 (1974)); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1983) ("the touchstone of due

18   process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

19   culpability of the prosecutor").

20          Factors to be considered in determining whether habeas relief is warranted include

21   whether the prosecutor manipulated or misstated the evidence; whether the conduct implicated

22   other specific rights of the accused; whether the objectionable content was invited or provoked

23   by defense counsel's argument; whether the trial court admonished the jurors; and the weight of

24   the evidence against the defendant.  *Darden*, 477 U.S. at 181-82.  Relief is limited to cases in

25   which the petitioner can establish that the misconduct resulted in actual prejudice.  *See Johnson*

26   *v. Sublett*, 63 F.3d 926, 930 (1995) (citing *Brecht*, 507 U.S. at 637-38); *Shaw v. Terhune*, 380

1  F.3d 473, 478 (9th Cir. 2004) (applying *Brecht's* "harmless error" test in evaluating a claim of

2  prosecutorial misconduct on habeas corpus).

3         Here, petitioner's prosecutorial misconduct claim premised on alleged false

4  testimony by Mendoza fails for lack of supporting facts.  A conviction obtained using knowingly

5  perjured testimony violates due process.  *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).  In

6  order to establish a claim for relief based on the introduction of perjured testimony at trial, a

7  petitioner must establish first, that material testimony was false, and second, that the prosecution

8  actually knew or should have known that the testimony was false.  *Jackson v. Brown*, 513 F.3d

9  1057, 1071-72 (9th Cir. 2008).  "Mere speculation" is not sufficient to demonstrate these

10  requirements.  *See United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991).  Here, petitioner

11  has no evidence, only speculation based on alleged inconsistencies in witness testimony at a prior

12  trial, that Mendoza's testimony was false or that the prosecutor knew or should have known it

13  was false.

14         As to the prosecutor's argument, it is significant that the prosecutor did not refer

15  to specific uncalled witnesses and tell the jury what that witness would have testified or tell the

16  jury that witness's testimony would have been the same as the evidence received at trial.  Rather,

17  the prosecutor asked rhetorically whether the single witness offered as to each count was

18  sufficient to prove the case or whether they would be tempted to find reasonable doubt because

19  there were not multiple witnesses.  The prosecutor's statement about "redundancy" was made in

20  the context of his immediately following observations that people do not need statements from

21  multiple sources in their ordinary lives to find them believable.

22         The trial court instructed the jury:

23         Neither side is required to call as witnesses all persons who may
           have been present at any of the events disclosed by the evidence or
24         who may appear to have some knowledge of these events.  Neither
           side is required to produce all objects or documents mentioned or
25         suggested by the evidence.

26  (RT at 1198.)  And:

1
2
3
4
5

You are not required to decide any issue of fact in accordance with the testimony of a number of witnesses, which does not convince you, as against the testimony of a lesser number or other evidence, which you find more convincing.  You may not disregard the testimony of the greater number of witnesses merely from caprice, whim or prejudice, or from a desire to favor one side against the other.  You must not decide an issue by the simple process of counting the number of witnesses.  The final test is not in the number of witnesses, but in the convincing force of the evidence.

6
7
8

You should give the testimony of a single witness whatever weight you think it deserves.  Testimony concerning any fact by one witness, which you believe, is sufficient for the proof of that fact. You should carefully review all the evidence upon which the proof of that fact depends.

9   (RT at 1199.)

10          The prosecutor's statements at issue here essentially made the same points as the

11   above quoted instructions from the court.  In other words, the jury was not to be concerned with

12   the small number of witnesses; one credible witness is sufficient.  Nor was the jury to speculate

13   as to what else could have been presented.  They were to decide the case based on the evidence

14   before them and not to discount the prosecution's case because there was only one witness as to

15   each attack.  In sum, the prosecutor's conduct of which petitioner complains did not deprive him

16   of due process of law.  And even if it was improper, the error did not have substantial and

17   injurious effect or influence on the jury's verdict in this case.

18          F.      Sentencing

19          "Other than the fact of a prior conviction, any fact that increases the penalty for a

20   crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond

21   a reasonable doubt." *Blakely v. Washington*, 542 U.S. 296, 301 (2004) (citing *Apprendi\ v. New*

22   *Jersey*, 530 U.S. 466, 490 (2000).  "[T]he 'statutory maximum' for *Apprendi* purposes is the

23   maximum sentence a judge may impose solely on the basis of the facts reflected in the jury

24   verdict or admitted by the defendant."  *Id*. at 303-304.  For his final ground, petitioner claims that

25   the trial court's selection of an upper term sentence violated the Supreme Court's holding in

26   *Blakely v. Washington*.

1        In rejecting petitioner's claim on direct review, the California Court of Appeal

2   applied *People v. Black*, 35 Cal.4th 1238, 1261-64 (2005) ("*Black I*"), to conclude that

3   California's determinate sentencing scheme at the time of petitioner's sentence did not violate

4   the Supreme Court's holding in *Blakely v. Washington*.  *People v. Bell*, *supra*, at 17.  The Ninth

5   Circuit has held, however, that *Black I's* result upholding California's sentencing scheme in that

6   manner was contrary to then existing clearly established Supreme Court precedent.  *Butler v.*

7   *Curry*, 528 F.3d 624, 640 (9th Cir. 2008).  Accordingly, petitioner's sentencing claim must be

8   reviewed de novo.  *Id*. at 641.

9        Nevertheless, it is clear that no relief is warranted.  Under California law, the

10  existence of a single lawfully found aggravating factor is sufficient to authorize an upper term

11  sentence.  *People v. Black*, 41 Cal.4th 799, 805 (2007) ("*Black II*"); *see also Butler*, 528 F.3d at

12  643-44.  In petitioner's case, it was the jury, as opposed to the judge, that found he had

13  previously been convicted of a serious or violent felony (murder) within the meaning of the three

14  strikes law.  (CT at 415.)  Moreover, in any event, *Blakely* does not preclude imposition of an

15  upper term based on the fact of a prior conviction.  *Blakely*, 542 U.S. at 301 ("*Other than the fact*

16  *of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed

17  statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

18  (emphasis added)).  Petitioner is not entitled to relief for any of his claims.

19                              VI.  CONCLUSION

20       For all the foregoing reasons, IT IS HEREBY RECOMMENDED that the

21  application for writ of habeas corpus be DENIED.

22       These findings and recommendations are submitted to the United States District

23  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

24  one days after being served with these findings and recommendations, any party may file written

25  objections with the court and serve a copy on all parties.  Such a document should be captioned

26  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

1  shall be served and filed within seven days after service of the objections.  Failure to file

2  objections within the specified time may waive the right to appeal the District Court's order.

3  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

4  1991).

5  DATED: June 14, 2011

6  CHARLENE H. SORRENTINO
   UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26